SANDERS LAW, PLLC
Craig B. Sanders, Esq. (Cal Bar. No. 284397)
csanders@sanderslawpllc.com
Jonathan M. Cader (*pro hac vice*)
jcader@sanderslawpllc.com
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Telephone: (516) 203-7600
Facsimile: (516) 281-7601

*Attorneys for Defendant*
*Barcroft Media, LTD.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFERY WERNER,<br><br>  Plaintiff,<br><br>  vs.<br><br>BARCROFT MEDIA, LTD AND VALNET, INC.,<br><br>  Defendants. | Case No.: No. 2:17-cv-02644-JFW-AS<br><br>**AFFIDAVIT OF SAM BARCROFT IN SUPPORT OF DEFENDANT BARCROFT MEDIA, LTD'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. John F. Walter<br>Magistrate: Hon. Alka Sagar<br><br>Action Filed:   April 6, 2017<br>Discovery Cutoff:  February 16, 2018<br>Pretrial Conf.:  Apr. 6, 2018, 10:00AM<br>Trial Date:   Apr. 24, 2018, 8:30AM<br><br>Hearing Date: _____, 2018<br>Time:   10:00AM<br>Courtroom:  255 E. Temple St.,<br>     5th Floor, Courtroom 540 |

I, SAM BARCROFT, pursuant to 28 U.S.C. §1746, declare under the penalty of perjury as follows:

1

DECLARATION OF SAM BARCROFT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1. I am the CEO and president of the Defendant Barcroft Media, Ltd. ("Barcroft") in the above-captioned action and, as such, am fully familiar with the facts and circumstances on which this Declaration is based. Except as otherwise stated, I have personal knowledge of the facts set forth in this Declaration, which are known by me to be true and correct. If called upon as a witness, I could and would testify in a Court of law as to the matters stated in this Declaration.

2. I submit this Declaration in Support of Barcroft's Motion for Summary Judgment, dismissing the claims leveled against it by Plaintiff, Jeffery Werner ("Werner" or "Plaintiff").

3. It is my understanding that Plaintiff commenced this case after he discovered that Defendant Valnet, Inc. ("Valnet") had allegedly copied an unspecified number of photographs owned by Plaintiff, and republished them without Plaintiff's permission.

4. It is my understanding that Plaintiff seeks to hold Barcroft secondarily liable for Valnet's infringements, by alleging that Barcroft purportedly contributed to or enabled Valnet's infringements and/or otherwise had the ability to control Valnet's infringements but failed to stop it from doing so.

5. As will be set forth more fully in this declaration, Plaintiff's claims against Barcroft must be dismissed because: (i) Valnet did not obtain the photographs at issue from Barcroft; and (ii) Barcroft has no control over Valnet's websites or YouTube channels and has no rights to them beyond that of any other third-party visitor to those sites.

6. By way of personal background, I am a photographer by trade who spent many years doing freelance work for various newspapers and magazines.

7. As I saw the landscape of the media market begin to change with the expansion of the internet – not only in where the consumer public was turning to for information – but the new formats in which that information was being

delivered, I decided to expand my solo business, leading to the creation of Barcroft.

8. In its infancy, Barcroft focused primarily on content creation – which is what I knew from my background. The majority of our work was on the creation of news stories, which we licensed to print, online and television shows, first in the United Kingdom, but gradually expanded our client base. Some of Barcroft's content was created by myself or the slowly but steadily increasing staff, but, to increase Barcroft's presence, content and notoriety, we also entered into agreements with outside photographers and videographers, which would allow Barcroft to distribute their content to our growing network of clients.

9. Over the years, Barcroft expanded its business to include its own TV brand, as well as its own YouTube channel. With its growing popularity and recognition, Barcroft was able to significantly expand its library, content and its clientele.

10. Today, Barcroft is well-recognized as a creator, curator, publisher, licensor and distributor of journalistic content, still photography and video imagery, which it makes available to a wide array of media outlets throughout the world. Barcroft is a creator of content to the extent that it employs a staff of photographers, videographers and writers who create content exclusively for Barcroft. Barcroft is a curator of content to the extent that it continues to maintain relationships with freelance producers for whom Barcroft distributes content through its network of world-renowned media outlets such as Mail Online, The Sun, The Guardian, The Daily Telegraph, the New York Post, Huffington Post, Buzz Feed, Bauer Media Group, BBC News, ABC News and CNN. Barcroft is a licensor of content to the extent that it makes content available to its clients for purchase. Barcroft is a publisher of content to the extent that it publishes its own works directly through Barcroft TV and its YouTube channels.

11. Relative to this case, in or about October of 2004, Barcroft entered into an oral understanding with Werner whereby Barcroft was granted permission to distribute Plaintiff's photographs in the United Kingdom. As Plaintiff correctly states in his Complaint, pursuant to the agreement, Barcroft could also seek to distribute Plaintiff's photographs to other media outlets, however, those agreements would be negotiated on a case-by-case basis.

12. Plaintiff was not involved in Barcroft's day-to-day operations. Instead, Plaintiff was only interested in having his works made available to a larger array of media outlets – such as those with whom Barcroft had relationships.

13. Plaintiff and Barcroft agreed on a percentage-based fee sharing arrangement and, pursuant to that agreement, Barcroft would generate and invoice itself on Plaintiff's behalf for any of Plaintiff's photographs distributed by Barcroft (described by Plaintiff as a "self-billing tax invoice"), together with a payment for Plaintiff's share of the revenues received.

14. Barcroft's relationship with Plaintiff proceeded amicably, productively and without event for more than ten (10) years, essentially until the time of the events underlying this lawsuit.

15. In or about November of 2015, Barcroft's team had discovered that certain of its works were being used by Valnet on at least one of its YouTube channels, specifically, "TheRichest.com".

16. More specifically, Barcroft's team discovered that Valnet displayed several photographs of a woman named "Andrianne Lewis," who is known as being the woman who has what may possibly be the "world's longest tongue."

17. The photographs of Andrianne Lewis are owned by Barcroft and were displayed in a YouTube video published by Valnet on its "TheRichest" channel under the title "Extremely Big Body Parts on People." Barcroft's records

indicate that the images were discovered after seeing a video having the caption "Is this the world's longest tongue."

18. Upon investigation, we discovered that Valnet was not a client or licensee of Barcroft. In fact, Barcroft was wholly unaware of Valnet's existence up until that point, as neither I nor Barcroft had any relationship with Valnet at that time.

19. As Valnet was not a client or subscriber of Barcroft's content, it did not have Barcroft's license or permission to use Barcroft's Andrianne Lewis photographs.

20. This discovery led to a further review of videos on TheRichest channel and, upon finding additional instances of infringement, Barcroft sent a copyright "strike notice" to YouTube objecting to Valnet's unauthorized use of unlicensed content in the "Extremely Big Body Parts on People" video.

21. Because the strike notice was directed at "TheRichest" channel, it is my understanding that the strike notice affected the channel as a whole, not just the "Extremely Big Body Parts on People" video mentioned in the notice.

22. At the time that Barcroft notified YouTube of the infringement, Barcroft's team had not completed its investigation of how many works had been infringed and/or whether there were infringements on any of Valnet's other YouTube channels.

23. More importantly as it relates to this matter, at the time Barcroft sent the "strike" notice to YouTube, Barcroft's team had not found any images belonging to Plaintiff. Instead, we believed that all of the content was strictly that of Barcroft.

24. After having sent the notice to YouTube, Barcroft received an email from Valnet's general counsel, as well as a follow up phone call.

25. The initial phone call led to an internal investigation wherein Barcroft identified approximately twenty nine (29) of its works, not including any

of Werner's images, as having been infringed on Valnet's "The Richest" YouTube channel.

26. On contacting Barcroft in response to the strike notice, Valnet indicated a desire to reach a settlement of the infringements, as well as a desire to enter into a licensing agreement that would allow Valnet access to – and use of – Barcroft's media library.

27. We advised Valnet that Barcroft would be willing to settle the infringements conditioned upon Valnet agreeing to never publish any Barcroft copyright-protected works without first obtaining a license from Barcroft.

28. Valnet was extremely eager in its desire to resolve Barcroft's claim and at all times appeared to be acting in good faith. For example, Valnet indicated that it would assign its own review team to examine the videos to confirm if there were any other Barcroft images that had been used without permission. Even before that review was completed, however, Valnet discussed terms to resolve Barcroft's claim.

29. Through the course of our conversations and exchanges, Valnet stated that it would prefer our agreement to not be a "one-off" settlement but, instead, was interested in negotiating a go-forward partnership with Barcroft. Regardless of how it would be worked out, Valnet clearly indicated a desire to enter into an agreement that would allow it to lawfully access Barcroft's library of unique and, often, exclusive content.

30. To reiterate, at the time of these discussions and exchanges, Barcroft was unaware that there were any of Werner's works associated with Valnet's infringement of Barcroft's own content.

31. Over the course of the next month, we eventually reached an agreement to settle Barcroft's claim against Valnet which, as was stated above, was believed to involve only 29 of Barcroft's exclusive images. As is common in the industry, upon settlement, we consented to making the agreement retroactive.

32. Thereafter, we negotiated a separate agreement allowing Valnet to license content from Barcroft's library – including new content as well as archived material, on a prospective basis.

33. At the time we resolved the infringement claim, Barcroft was unaware that any of Plaintiff's images had allegedly been infringed by Valnet. This was because Valnet had copied the images from a source (or sources) unknown to Barcroft and had not obtained them from Barcroft's library. As a result, the negotiations between Barcroft and Valnet never included any discussion of content owned by Plaintiff.

34. Further to this point, as the Court can see from the parties' settlement agreement, the video that caused Barcroft to send a notice of copyright infringement to YouTube was a video posted by Valnet entitled "Extremely Big Body Parts on People". *A copy of the Settlement Agreement is annexed hereto as Exhibit "1".* The video was located on Valnet's "TheRichest" channel at the following URL: www.youtube.com/channel/UCdxi8d8qRsRyUi2ERYjYb-w. *See id.*

35. In the FAC, Plaintiff does not claim that any content allegedly owned by him was displayed in the "Extremely Big Body Parts on People" video. In fact, Plaintiff does not mention the "Extremely Big Body Parts on People" video at all, and Barcroft is unaware of any claim Plaintiff may have made otherwise

36. At the time of the settlement, Valnet did not have access to Barcroft's media library.

37. In fact, Valnet did not have any access to Barcroft's media library until after December 14, 2015, the date on which Barcroft and Valnet executed the license agreement. *A copy of the license agreement is annexed hereto as Exhibit "2".* Barcroft's records show that Valnet's first download from Barcroft's library occurred on December 16, 2015.

7
DECLARATION OF SAM BARCROFT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

38. In order to access Barcroft's media library, a customer must have a user ID and password assigned from Barcroft.

39. It was not until issuance of the license agreement that Valnet was given a user ID and password to access Barcroft's media library, which is the only way for a client to download content from Barcroft. Barcroft issued these credentials to Valnet on December 15, 2015.

40. Any Barcroft-owned content that was not obtained by Valnet by proper download was and is not authorized by Barcroft and was not licensed by Barcroft under the prospective license agreement.

41. Had Valnet copied the images from Barcroft's library, we would have been readily able to ascertain exactly what images were at issue by tracking the download through the customer's user ID.

42. Barcroft never identified or communicated to Valnet that the license agreement included any of Plaintiff's images.

43. Had we known that Valnet sought to include Plaintiff's images in the settlement agreement, we would have affirmatively notified Valnet that Barcroft did not have the authority to license those images in the United States.

44. Apropos of this statement, it is my understanding that Valnet has never contended that Barcroft purported to license Werner's images to it, expressly or impliedly. Instead, it is only Plaintiff who has taken such a position.

45. In other words, contrary to Plaintiff's assertion, Barcroft never made any representation, expressly or otherwise, that it had the authority to issue a license for Plaintiff's works to Valnet.

46. Further to this point, Barcroft specifically stated to Valnet in negotiating the go-forward agreement that Valnet's right to access Barcroft's library and archives of content would only cover images (i) which Valnet obtained from Barcroft's media library via download; and (ii) for which Barcroft held world-wide distribution rights.

47. Barcroft qualified this statement by expressly indicating that it represents certain content generators that Barcroft is only licensed to distribute in certain territories.

48. The license agreement expressly excludes content that is not available for world-wise distribution. *See Exhibit "2".*

49. As the settlement agreement was being finalized, Valnet advised Barcroft that it had discovered additional images that had been infringed in other videos – bringing the total number to forty (40). Valnet did not specifically state what images were at issue, however. Instead, it merely identified its videos as the source.

50. After the settlements had been consummated and Valnet provided this new information, it was not until early 2016 that Barcroft's team performed a supplemental and further review of the associated images in the Valnet posts. The purpose of this supplemental review was to identify any third-party contributors and to allocate their respective shares of the license fee with Valnet.

51. It was not until further review that Barcroft became aware that any images belonging to Werner had also been used by Valnet.

52. Because we had identified five images as belonging to Plaintiff – albeit an after-the-fact discovery – it was our policy to forward Plaintiff his proportionate share of the settlement funds, which we did.

53. In this process Barcroft allocated and remitted £514.31 (approx. $600) to Plaintiff who rejected this payment.

54. The £514.31 represents the only money which Barcroft could arguably be holding which could belong to Plaintiff.

55. At the time, and much to my dismay, I did not envision that Barcroft's gesture of good-will in forwarding compensation to Plaintiff would be twisted by Plaintiff in the manner that it has been – resulting in this lawsuit.

56. To summarize, I have reviewed Barcroft's records and find that none of the images identified in either the Complaint or FAC were downloaded by Valnet from Barcroft's library – either before or after the date of Valnet's alleged use thereof.

57. In fact, Barcroft has never provided any of Plaintiff's images to Valnet – either before or after the date of Valnet's alleged infringement.

58. Further, Barcroft did not "assist" Valnet in obtaining Plaintiff's images – either before or after the date of Valnet's alleged infringement – in any manner suggested by Plaintiff.

59. Indeed, as of the date of this Declaration, Barcroft does not know the source from which Valnet allegedly obtained Plaintiff's images, or how they were incorporated into the videos authored by Valnet. All I do know is that they were not sourced from Barcroft.

60. Stated succinctly, Valnet has never obtained any of Plaintiff's images from Barcroft at any time.

61. Barcroft and Valnet had no relationship whatsoever prior to our sending of the "strike" notices at which time the allegedly infringing content by Valnet had already been created and posted by Valnet.

62. As it relates to Barcroft's current business relationship with Valnet, our license agreement does nothing more than allow Valnet to download (or purchase) images from Barcroft's library – and is limited to content which is marked as being available for world-wide distribution. Plaintiff's images are not so marked.

63. The license agreement does not allow Valnet to download (or purchase) any images for which distribution rights are limited, such as those created by Plaintiff.

64. The license agreement does not provide Barcroft with access to Valnet's servers, websites or YouTube channels, beyond that available to any third-party visitor.

65. There are no other agreements between Barcroft and Valnet that would allow Barcroft access to Valnet's servers, websites or YouTube channels, beyond that available to any third-party visitor.

66. The license agreement does not allow Barcroft to independently review any content on any of Valnet's servers, websites or YouTube channels prior to publication.

67. There are no other agreements between Barcroft and Valnet that would allow Barcroft the right to independently review any content on any of Valnet's servers, websites or YouTube channels prior to publication.

68. The license agreement does not allow Barcroft to independently review any content on any of Valnet's servers, websites or YouTube channels after publication, other than as a visitor to the websites or YouTube channels.

69. The license agreement does not allow Barcroft to independently edit any content on any of Valnet's servers, websites or YouTube channels prior to publication.

70. There are no other agreements between Barcroft and Valnet that would allow Barcroft the right to independently edit any content on any of Valnet's servers, websites or YouTube channels prior to publication.

71. The license agreement does not allow Barcroft to independently edit any content on any of Valnet's servers, websites or YouTube channels after publication.

72. There are no other agreements between Barcroft and Valnet that would allow Barcroft the right to independently edit any content on any of Valnet's servers, websites or YouTube channels after publication.

73. The license agreement does not allow Barcroft to independently remove any content on any of Valnet's servers, websites or YouTube channels prior to publication.

74. There are no other agreements between Barcroft and Valnet that would allow Barcroft the right to independently remove any content on any of Valnet's servers, websites or YouTube channels prior to publication.

75. The license agreement does not allow Barcroft the right to independently remove any content on any of Valnet's servers, websites or YouTube channels after publication.

76. There are no other agreements between Barcroft and Valnet that would allow Barcroft the right to independently remove any content on any of Valnet's servers, websites or YouTube channels after publication.

77. Barcroft has no access to Valnet's servers, websites or YouTube channels, beyond that of any third-party visitor.

78. To be clear and, similarly, Barcroft had no access to Valnet's servers, websites or YouTube channels beyond that of any third-party visitor before entering into the license and/or go-forward agreements.

79. As to Plaintiff's claim that there is purportedly a fiduciary relationship between himself and Barcroft, I share no such understanding.

80. From the outset, we agreed that Barcroft would have the right to be a distributor of Plaintiff's works – at least in the UK – with the option to negotiate the right to distribute his works elsewhere, should Barcroft find such an opportunity for Plaintiff.

81. Plaintiff's contention that there was a fiduciary relationship between himself and Barcroft not only defies all logic, it is belied by the facts.

82. Outside of the limited relationship established between the parties Barcroft and Plaintiff each create content for distribution of the internet.

83. While Plaintiff and Barcroft have collaborated on a few projects, and Barcroft has agreed to distribute some of Plaintiff's images from its platforms, Barcroft and Plaintiff are otherwise competitors.

84. As was noted above, Barcroft is itself a content creator and distributor. Why would Barcroft enter into a relationship with Plaintiff that would arguably require to put Plaintiff's interests above that of its own – particularly where, as here, Plaintiff has not given Barcroft anything resembling an exclusive license to his works? To the contrary, all Plaintiff has given Barcroft is a limited right to distribute Plaintiff's works.

85. Beyond that, the facts show that Barcroft has never agreed either orally or in writing to be a fiduciary of Plaintiff.

86. Even if Plaintiff could establish the existence of a fiduciary relationship between himself and Barcroft – which he has not – Plaintiff has failed to show that his claim would exceed $75,000, and it would not. Indeed, the claim – if viable – would be worth several hundred dollars at best. As was stated above, the amount at issue is remitted £514.31 (approx. $600).

87. Plaintiff's claim for money had and received should also be dismissed because, if Plaintiff is entitled to any money, Barcroft has already offered same to Plaintiff. Also, as with the above, the claim – if viable – would be worth no more than six hundred dollars ($600.00) at best.

88. Plaintiff's claims are also not viable because I have seen no evidence that Valnet actually posted any images or other content that is allegedly owned by Plaintiff.

89. Even if Plaintiff had made such a showing, I have seen no evidence in this case to support Plaintiff's claim that the images were obtained from – or with the assistance of Barcroft.

90. More specifically, in the FAC, Plaintiff alleges that Valnet posted a video through "theRICHEST" website on February 27, 2015, allegedly containing

the "world's smallest mom" images in a video titled "The 10 Oddest Mothers In the World." *See* FAC at ¶ 63.

91. The FAC does not identify the uniform resource locator ("URL") at which these images were allegedly observed, and there is no exhibit to the Complaint or FAC that shows the "world's smallest mom" images being displayed on "theRICHEST" website or YouTube channel.

92. Notwithstanding the foregoing, Barcroft's team searched for a video titled "The 10 Oddest Mothers In the World" and found a video located at the following URL: https://www.youtube.com/watch?v=Sz6yerNSFxg which is hosted by theRICHEST on YouTube.

93. The information associated with this video indicates that it was published on February 27, 2015. *See* https://www.youtube.com/watch?v=Sz6yerNSFxg.

94. In reviewing the video, Barcroft's team did not see any of the images annexed to the FAC as Exhibits "2" or "3" being currently viewable in the video.

95. There is nothing in the commentary or history suggesting that the video was edited or modified since the stated initial date of posting.

96. While I understand that Plaintiff has produced "screen grab" purporting to show that his "world's smallest mom" images annexed to the FAC as Exhibits "2" or "3" were, in fact, displayed in the video, I do not see the date on which the screen grab was purportedly captured. Further, Barcroft was not made aware of Plaintiff's claim in this regard until the filing of this lawsuit, despite the fact that Plaintiff claims that he discovered Valnet's alleged infringement months before the commencement of this action yet never notified Barcroft of same.

97. Equally important is what we have seen in the "The 10 Oddest Mothers In the World" video.

98. The video features images of ten (10) different individuals – as it states in its descriptive title.

99. There are approximately thirty nine (39) separate images featured in this video of the 10 different individuals. Of those 39 images, Plaintiff alleges in the FAC that he owns four.

100. Of the remaining thirty five images featured in the "10 Oddest Mothers In the World" video, Barcroft owns eight (8). As this discovery was not made until after the settlement agreement was reached, as the Court can see, the settlement agreement makes no mention of "The 10 Oddest Mothers In the World" video. *See Exhibit "1".* That is because Barcroft had no specific discussion concerning "The 10 Oddest Mothers In the World" video with Valnet at the time of the parties' settlement or in negotiating the go-forward license.

101. Although it is not clear from the FAC if Plaintiff is alleging that Barcroft purported to give Valnet a license for any or all of the 39 images appearing the "10 Oddest Mothers In the World" video, if Plaintiff has made such an allegation, he would be wrong.

102. Barcroft does not know who owns the other twenty seven (27) images used in the "10 Oddest Mothers In the World" video, outside of being able to see any attribution given by Valnet in the video.

103. Even if Plaintiff's evidence is sufficient to show that the "world's smallest mom" images were displayed in the "10 Oddest Mothers In the World" video, the date of posting by Valnet preceded Valnet's relationship with Barcroft by some ten (10) months.

104. The same is true with respect to Plaintiff's allegations concerning Plaintiff's "Barb Guerra" image(s).

105. As with the allegations pertaining to the "world's smallest mom" images and/or video, the FAC fails to state the URL at which the video was

purportedly posted by Valnet and does not identify the date of posting, beyond it having been posted "in 2015." *FAC at ¶ 74.*

106. Barcroft's team has searched for a video titled "10 Most Unusual Bodybuilders in the World," which is that identified by Plaintiff in the FAC. *See id.*

107. We found a video with that title posed by Valnet at the following URL: https://www.youtube.com/watch?v=Mi2swjZBr48.

108. The information associated with this video indicates that the video was posted to the RICHEST YouTube channel on October 27, 2015. *See* https://www.youtube.com/watch?v=Mi2swjZBr48.

109. While the video begins with a showcase of "Barbrie Steinholt-Thomas" and displays several images of the individual identified by Plaintiff in the FAC as "Barb Guerra," there are no images currently viewable in the video which match those contained in Exhibit "7" to the FAC. *See id.*

110. I do not see the date on which the screen grab was purportedly captured by Plaintiff. Further, Barcroft was not made aware of Plaintiff's claim in this regard until the filing of this lawsuit, despite the fact that Plaintiff claims that he discovered Valnet's alleged infringement months before the commencement of this action yet never notified Barcroft of same.

111. As with the "10 Oddest Mothers In the World" video, it is important to note what can be seen in the "10 Most Unusual Bodybuilders in the World" video.

112. The "10 Most Unusual Bodybuilders in the World" features, as the title suggests, stories on ten (10) different individuals.

113. Barcroft's team has watched the video and see that there are approximately one hundred fifty (150) individual photos featured in the video, of which Plaintiff claims to own one (1). *See Exhibit "7" to the FAC.*

114. In contrast to Plaintiff's claim, Barcroft owns no less than five (5) photos that were featured in this video.

115. Barcroft did not purport to license Plaintiff's image – or any of the remaining one hundred forty four (144) images used by Valnet in this video, either at the time of the parties' settlement agreement or at any time thereafter.

116. Barcroft does not know who owns the remaining 144 images used by Valnet in this video, beyond seeing any attribution displayed on the photographs themselves or in the video as posted by Valnet.

117. The "10 Most Unusual Bodybuilders in the World" video contains attributions to approximately seventeen third-party sources besides Barcroft – none of which are Plaintiff.

118. Even if Plaintiff had provided evidence in the FAC to show that the "Barb Guerra" images were displayed in the "10 Most Unusual Bodybuilders in the World" video, the date of posting by Valnet preceded Valnet's relationship with Barcroft by some two (2) months.

119. I see no evidence the "Barb Guerra" images annexed to the FAC as Exhibit "7" to the FAC were actually used by Valnet.

120. Even Plaintiff had not shown that the "Barb Guerra" images annexed to the FAC as Exhibit "7" to the FAC were actually used by Valnet – which he has not – Plaintiff has failed to show that such images were obtained from, or with the assistance of Barcroft. They were not.

121. Further to this point, the two (2) videos identified as being at issue by Plaintiff contain many images that have no attribution as to source or, otherwise, have attributions to at least seventeen (17) sources other than Barcroft or Plaintiff.

122. At the time that Barcroft negotiated the settlement agreement with Valnet, we did not know how many third-party images Valnet had used, if any. Instead, we were only concerned with the images we had identified as belonging to Barcroft.

17
DECLARATION OF SAM BARCROFT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

123. We did not solicit Valnet to provide evidence of licenses from third-parties as it was not our place to inquire if rights had been obtained and it would be irrelevant to Barcroft's purpose in policing the use of only its images. Indeed, Barcroft had no authority to license the use of any third party's content, and we did not make any representation to that effect, nor did Valnet expect us to.

124. The fact that the videos are still being shown with other third-party content shows that Valnet would not have been deterred, but for the agreement with Barcroft, as Plaintiff suggests, because there has been no allegation that Barcroft purported to license any of the additional content in the videos – which it did not.

125. Plaintiff's claims against Barcroft have no basis in fact or law and must be dismissed.

Executed on January 29, 2018 in London, England.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Sam Barcroft